# Massachusetts Mutual Life Insurance Company v. Bush.

(Decided November 21, 1930.)

ROSS & ROSS for appellant.

G. MURRAY SMITH for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

On September 30, 1929, appellant issued to Charles H. Bush a policy insuring his life in the sum of $1,000. His mother, the appellee, was the beneficiary of the policy. He paid the annual premium, $36.79, upon the delivery of the policy. The policy provided that if the death of the insured occurred as the result of bodily injury, solely through external violent and accidental means, the company agreed to pay $1,000 additional. The policy contained this provision:

"If within the year next following the date of issue of this policy the insured, whether sane or insane, shall die by his own hand or act, the company will be liable only for the amount of the permiums paid hereunder."

The provision for accidental death benefit contained this provision:

"The benefits under this provision shall not be payable if the death of the insured resulted directly or indirectly from self destruction at any time, whether sane or insane, or any attempt thereat."

On October 27, 1929, about 3:30 p. m., a man passing on the Stony Run Pike, not far from where Charles H. Bush lived, saw Bush sitting in the front seat of his car at the steering wheel; the motor was running. No other

person was in the car. He had his left hand either lying in his lap or near the handle of a .32 Smith and Wesson pistol. The point of this pistol was pointed downward toward the seat of the car, and the butt of the pistol was lying on his right leg, about the point where the leg and body join. The pistol had recently been fired. The other chambers of the cylinder were loaded; the barrel smelled strongly of fresh powder. Bush was shot in the forehead, just above the eye, and the ball ranged downward and backward. It did not come out. Bush was a farmer living with his mother. About 3 o'clock on that day he went to the home of Van Hoskins, a neighbor, in his car, and after staying there awhile and talking to Hoskins, apparently in perfect health, natural and in a good humor, and after looking at Hoskins' tobacco and a horse that Hoskins had, he said somebody had been getting in his chicken roost and he wanted to borrow Hoskins' gun. They then went to the house together. Hoskins gave him the pistol and he drove off in the car. A few minutes after this he was found shot, as above stated, sitting in the road between Hoskins' house and his house. There was proof by a number of people who knew him that he was a jolly, pleasant companion, in perfect health and always in a good humor. He was thirty-three years old; he had rented a farm to cultivate the next year. This suit was brought by the mother to recover on the policy, and judgment having been entered in her favor for $2,000, the company appeals.

Section 2062a-7, Kentucky Statutes, makes the following provision as to the death certificate:

"The medical certificate shall be made and signed by the physician, if any, last in attendance on the deceased, who shall specify the time in attendance, the time he last saw the deceased alive, and the hour of the day at which death occurred. And he shall further state . . . the course of disease or sequence of causes resulting in death, giving the primary cause, . . . if any, and the duration of each. Indefinite and unsatisfactory terms, indicating only symptoms of disease or conditions, resulting from disease, will not be held sufficient for issuing a burial or removal permit; and any certificate not containing such terms as defined by the state registrar shall be returned to the physician for correction and definition. Causes of death, which may be the result of

either disease or violence, shall be carefully defined, and if from violence, its nature shall be stated, and whether (probably) accidental, suicidal, or homicidal. And in case of deaths in hospitals, institutions, or away from home, the physician shall furnish the information required under this head, and shall state where, in his opinion, the disease was contracted."

Subsection 21 of the same section contains this provision:

"That the state registrar shall, upon request, furnish any applicant a certified copy of the record of any birth, sickness or death registered under provisions of this act, for the making and certification of which he shall be entitled to a fee of fifty cents, to be paid by the applicant. And any such copy of the record of birth, sickness or death, when properly certified by the state registrar to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated."

On the trial of the case the company produced a properly authenticated copy of the death certificate, which, among other things, read as follows:

"I hereby certify that I attended deceased from October 27, 1929, to October 28, 1929, that I last saw him alive on October 28, 1929, and that death occurred on the date stated above at 11:30 P. M. The cause of death was as follows: Self inflicted gun shot wound through head."

The court refused to allow the paper to be read to the jury, and the company excepted. The statute only makes the certificate prima facie evidence. It is within the power of the Legislature to prescribe rules of this sort. The statute is valid. The circuit court erred in refusing to allow the certificate to be read. Louisville & N. R. v. Rowland, 215 Ky. 663, 286 S. W. 929; Metropolitan Life Ins. Co. v. Cleveland, 226 Ky. 621, 11 S. W. (2d) 434; Inter-Southern Life Ins. Co. v. Hinkle, 226 Ky. 724, 11 S. W. (2d) 913. Louisville R. Co. v. Raymond, 135 Ky. 738, 123 S. W. 281, 284, 27 L. R. A. (N. S.) 176, which appellee relies on, rests upon this ground as shown by the opinion: "While the statute requires the physician to give the death certificate, there is nothing in the

statute making the certificate evidence in judicial proceedings.'' The present statute does this.

By instruction 1 the jury were told in substance that they should find for the plaintiff if the death of the insured occurred through accidental means. By instruction 2 they were told that if his death resulted directly or indirectly from intentional self-destruction, or any attempt thereat, that they should find for the defendant. Instruction 3 was in these words:

> ''The presumption of law and the presumption of fact are against suicide.''

This instruction should not have been given. It was simply a question for the jury on all the evidence whether the death of the deceased was by accident as set out in instruction 1 or intentional suicide, as set out in instruction 2.

The real issue in the case was whether the deceased shot himself accidentally or intentionally. There was no presumption that he shot himself accidentally. The burden was upon the plaintiff to make out her case. The court therefore properly placed the burden upon her in the whole case. Bingham v. Continental Casualty Co., 219 Ky. 501, 293 S. W. 968. The substance of the answer of the insurance company is that the insured committed suicide. The sum of the plaintiff's petition is that he died by accident. This is the sum of the pleadings when read together.

The rule is that if there is any evidence the question is for the jury. The proof here was wholly circumstantial. No motive for suicide was shown. The court properly refused to give a peremptory instruction for the defendant, as it was a question for the jury under the circumstances whether the deceased died by accident or suicide.

Judgment reversed, and cause remanded for a new trial.