**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,**

**v.**

**Hattie Belle REDWINE et al., Administratrix of the Estate of Walter S. Ewen, Deceased, Appellees.**

Court of Appeals of Kentucky.

Oct. 9, 1959.

Rehearing Denied March 25, 1960.

R. W. Keenon, Stoll, Keenon & Park, Gladney Harville, Lexington, Edward Jackson, Beattyville, for appellant.

M. C. Redwine, Sr., M. C. Redwine, Jr., Winchester, for appellees.

STEWART, Judge.

The Prudential Life Insurance Company of America (herein called "the company") moves for an appeal and seeks to reverse a judgment for $2,000 recovered against it by appellees upon an insurance contract for the alleged accidental death of the insured.

The company issued a life insurance policy wherein it insured a group of employees of the Louisville & Nashville Railroad Company (herein called "L. & N."). The life of Walter S. Ewen, an employee of L. & N., was thereafter covered by a certificate issued under this policy. This certificate provided for the payment of an ordinary death benefit of $2,000 and an additional accidental death benefit of $2,000.

Upon proper presentation of proof of death of Ewen, the company paid the ordinary death benefit of $2,000, but denied all liability under the accidental death provision of the policy, claiming Ewen's death ensued from self-destruction. For this action taken by the company it relies upon a clause contained in the policy and certificate which excludes liability for the accidental death benefit if the death of the insured resulted from suicide, whether he was sane or insane at the time.

An action to recover the additional benefit of $2,000 was instituted against the company by the beneficiary and administratrix of the estate of the intestate, Hattie Belle Redwine, her contention being that Ewen came to his death through accidental means. Although Hattie Belle Redwine sues the company in a dual capacity we shall refer to her hereinafter in the singular as "appellee". A jury trial was had and, at the conclusion of all the evidence, both sides moved for a directed verdict which was refused. Upon submission of the issue as to the cause of Ewen's death to the jury, they were unable to reach a verdict, and they were discharged.

Thereafter, each of the respective parties filed a motion for judgment notwithstanding the failure of the jury to reach a verdict, and the motion of appellee was sustained, followed by the entry of the judgment above noted. See CR 50.02.

In urging a reversal, the company contends the trial court was in error in two respects: First, because appellee's motion was not supported by any proof of a material nature; and, secondly, because the company's motion should have been sustained and judgment entered dismissing the complaint on the ground that Ewen's death was conclusively shown to have been suicidal.

We believe the overwhelming weight of the evidence established beyond doubt that Ewen committed suicide. This is, of course, a fact case and in order to substantiate the conclusion we have reached it will be necessary to analyze the testimony somewhat in detail.

On January 6, 1956, Ewen died from a self-inflicted gunshot wound while sitting on his bed in his room at a boarding-house in Beattyville. He was 58 years old at the time. After working for L. & N. for many years, he retired in 1954 because of ill health. His pension upon retirement amounted to $134 per month. That same year, Ewen's marriage of twenty years to Edna B. Ewen was terminated, with the wife being granted a divorce from bed and board and an award of alimony of $110 per month. Following his divorce, Ewen spent a short time in Jackson and in Corbin, and then went to Knoxville, Tennessee, where he lived for some eighteen months. Leaving Knoxville, he returned to Beattyville in the fall of 1955 and there resided at a boardinghouse until his death some five months later. It was brought out that, during the time he was moving about, he was in the grip of an unhappy and unsettled state of mind, no doubt due to the breakup of his family life and, also, because of his financial inability to keep up his alimony payments.

Looking to the evidence concerning the shooting of himself, it was established that the bullet entered Ewen's body "three inches below the level of the breast". Luther G. Newman, the funeral director, testified he found no bullet hole on the front of Ewen's shirt, but one button on his outer shirt was unbuttoned and his undershirt had a hole in it at that point and the undershirt was powder burned. The left index finger of decedent had powder burns on it, according to Newman, "where it looked like it might have been crooked in there." The only interpretation we can place on this language of the witness is that he meant Ewen used his left hand to hold his outer shirt open at the point where it was unbuttoned, and that he inserted the pistol barrel through this opening with his right hand and fired the fatal blast through his undershirt and body. This witness also stated that the bullet ranged through

Ewen's body and into a wall on a level which clearly indicated that the gun was fired by decedent while he was in a sitting position on the side of the bed. Linville Price, Chief of Police of Beattyville, was on the scene shortly after the shooting and his testimony corroborated that of Newman in every detail. As to the powder burns on and hole in the undershirt, he said he found "a great big hole, looked like it was burned out by powder."

While on his sojourn in Knoxville in 1954 and 1955, Ewen rented an efficiency apartment for several months from Everett Furchtgott, a professor of psychology at the University of Tennessee. The latter testified that, in conversations he had with Ewen on more than one occasion, Ewen seemed depressed and, in relating his troubles to Furchtgott, several times stated, "I wish I didn't have to live," or words of like import. The wife of Everett Furchtgott, who talked with Ewen many times, was asked this question: "What did he say about suicide, would he talk to you about that?" Her answer was: "He talked about that frequently in different ways. He wanted to know how to do something to himself that wouldn't be painful, if he would shoot himself, where he could shoot himself, where to shoot to make sure and he wanted to know if I had a gun, and I told him no. He wanted to know if I would buy him one, and I told him I didn't think that was possible unless you had a permit. * * *"

Ewen was attended and treated by Doctor Harold L. Neunschwander, a practicing physician, during his stay in Knoxville. This physician in making his final diagnosis of Ewen's ailments, after listing him with having a moderately advanced case of cerebral arteriosclerosis and a hypertensive vascular condition, stated that he had suicidal tendencies. Ewen's ex-wife described him as being a moody person and further testified in this vein: "He would get down in the dumps and he would say, 'Oh, well, I will kill myself.' I have heard him make that statement several times." Carlie Guy,

a woman boarder at the house where Ewen stayed in Beattyville, testified she often saw and talked with him up until the time of his death. She was asked what he told her about his wanting to live, and her reply was: "Well, he said he didn't have anything to live for, * * *."

So much for the proof put forward by the company to establish its claim that Ewen intentionally killed himself. The evidence introduced by appellees sought to build up a picture of Ewen as a man who had no inclination toward suicide. Decedent's sister, Hattie Belle Redwine, vigorously denied ever having heard Ewen threaten to take his own life, although she did admit she took a pistol away from him after he returned to Beattyville. She said she saw him nearly every day during the five months before he died, and that during this period his health continued to improve and his spirits were uniformly good. However, her testimony as regards Ewen's well-being brought out the fact that his high blood pressure made him dizzy, impaired his mobility, and caused his fingers to "draw up".

According to the testimony of the other boarders in the house where he lived, he did not appear depressed and they had never heard him mention suicide. They stated he had a pistol which he oiled and cleaned every two or three weeks; they observed that he liked to "fool with" the pistol. This line of testimony was corroborated by decedent's son, an engineering student at the University of Kentucky, and by two persons who knew him well in Knoxville.

Based upon the foregoing evidence, the trial judge concluded the proof we have set forth was insufficient to warrant submission again of the question of suicide to a jury, and thereupon adjudged that Ewen's death was produced by an accident. One persuasive circumstance that the lower court was in error in so ruling is that the jury impaneled to determine this very issue was unable to return a verdict in the case. Possibly one explanation of the errant ac-

tion taken below is that the trial court may not have been clear as to just which of the parties had the ultimate burden of proof. In a case such as the one before us, even though a presumption existed at the time of his death that Ewen did not commit suicide, the ultimate burden of proving he died accidentally was imposed upon appellee. This is clearly brought out in the case of Aetna Life Ins. Co. v. Tooley, 5 Cir., 16 F.2d 243, at page 244, which is quoted in Thelen v. Mutual Life Ins. Co., Ky., 261 S.W.2d 427, 428, by this statement:

"'* * * the presumption against suicide is overcome, where the preponderance of the evidence is consistent with the theory of suicide, and is at the same time inconsistent with any reasonable hypothesis of death by accident or by the act of another.' *It must be remembered that the plaintiff had the burden on the whole case of proving death by accident*, Massachusetts Mut. Life Ins. Co. v. Bush, 236 Ky. 400, 33 S.W.2d 351."

The case of Prudential Insurance Company v. Tuggle's Adm'r, 254 Ky. 814, 72 S.W.2d 440, 443, is factually comparable to the one under consideration. Tuggle, also an employee of L. & N., had not lost his job but had been demoted from engineer to fireman of a locomotive. There, as here, evidence was introduced to show that Tuggle was even-tempered and happily situated. However, unlike Ewen, Tuggle had a family to which he was devoted. In the few days preceding his death, the evidence showed that Tuggle acted strangely and disregarded close acquaintances. He was killed in the morning by a discharge from a rifle which was found resting on a barrel near his body. He had apparently proceeded to a dark, secluded spot under his house and there shot himself. In that case the trial court submitted the issues raised to a jury and a verdict was returned in favor of the beneficiary. In reversing the judgment and holding that the Prudential Insurance Company was entitled to a directed verdict, this Court stated:

"We have abundant facts proven from which it can be inferred Tuggle committed suicide, and a conclusion rested on an inference is sound. See Kidd v. Modern Amusement Co., 252 Ky. 386, 67 S.W.2d 466. We have no facts from which we can infer this was an accident. Of course, one may guess this was an accident by supposing Tuggle had taken his gun into this basement to kill a rat and discharged it accidentally, but a supposition has no legitimate support or habitation in judicial administration. (Citations omitted.)

"We are persuaded that this which is taken from a syllabus written by the court in the case of Agen v. Metropolitan Life Ins. Co., 105 Wis. 218, 80 N.W. 1020, 1021, 76 Am.St.Rep. 905, is correct: 'Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for a reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial court as one of law.'"

In the instant case the evidence is even more convincing than in the Tuggle case that Ewen's death was suicidal. As in the Tuggle case, abundant facts were proven in the case at bar from which it can be clearly inferred that Ewen committed suicide. On the other hand, there is no proof from which it can be deduced that the shooting was accidental. The repeated threats of suicide of a sickly, disheartened man, plus the immediate circumstances of his death, leave no room for doubt on the issue. This conclusion is inescapable and there is no room for any speculation or surmise to the contrary. Clearly, Ewen intentionally ended his own life.

It follows that the company's motion for a directed verdict should have been sustained at the conclusion of all the evidence.

Wherefore, the judgment is reversed with directions that a new one be entered for the company.

BIRD and EBLEN, JJ., dissenting.