This is an appeal from a judgment entered on a jury verdict in favor of the defendant in a wrongful death action in which the plaintiff alleged that the defendant had committed medical malpractice that caused the death of her husband. We affirm.
Deborah L. Brackett, Jesse Brackett's widow and the administratrix of his estate, sued Jack T. Coleman, M.D., for his failure to diagnose and treat renal failure and diabetic ketoacidosis when he saw her husband in his office on February 15, 1984. Mrs. Brackett contends that this failure caused Jesse Brackett to experience respiratory and cardiac arrest the next day, which resulted in his death five days later.
Dr. Coleman first examined Mr. Brackett on April 9, 1981, and was aware of his diabetic condition. However, Dr. Coleman testified that Mr. Brackett expressly requested that Dr. Coleman treat his high blood pressure condition, but not his diabetes, because he was under the care of a diabetes specialist. During the next three years, Dr. Coleman treated Mr. Brackett on five occasions.
During the office visit on February 15, 1984, Mr. Brackett informed Dr. Coleman that he had vomited, that he had some swelling in his feet and legs, that he was short of breath while lying down, and that he was generally feeling bad. The office personnel weighed Mr. Brackett and checked his blood pressure. Dr. Coleman then checked for signs of dehydration, including acetone smell on the breath. Dr. Coleman found that Mr. Brackett was well hydrated and had no such smell on his breath. Also, Mr. Brackett had no sign of dry tongue or chronic uremia (frost around the mouth). Dr. Coleman checked for enlargement of the carotid gland and for enlargement of the thyroid; he found enlargement in neither. Dr. Coleman inquired about urinary problems, and found no indication of polyuria (increased urination) or nocturia (nighttime urination). Dr. Coleman felt Mr. Brackett's chest to check for signs of enlargement of the heart; he found none. There was no sign of a heart "thrill" (a rising of the surface of the heart), which would indicate a prior heart attack. He found normal pulses in both arms. Dr. Coleman checked Mr. Brackett's hand to ascertain whether it was dry (indicating diabetic ketoacidosis) or sweaty and cold (indicating hypoglycemia); he found neither condition.
Dr. Coleman also checked for signs of congestive heart failure. In this regard, he raised Mr. Brackett's hands to cardiac levels, checking for collapse of veins, which would indicate congestive heart failure; this finding was negative. Mr. Brackett displayed distended neck veins, which are indicative of congestive heart failure. Dr. Coleman checked for the rate of the heartbeat, because severe congestive heart failure is accompanied by an increased heart rate. Mr. Brackett's heart rate was not increased, nor did he have any arrhythmia of the heart. Dr. Coleman determined from this that any congestive heart failure was probably not severe. Dr. Coleman also checked Mr. Brackett's breathing, listening to the lungs. Dr. Coleman found no blockage and "no wheezing whatsoever." Dr. Coleman also checked for, and did not find, other signs of advanced chronic congestive heart failure, including enlarged liver, tenderness in the abdomen, and signs of an enlarged spleen.
Dr. Coleman then examined Mr. Brackett's legs. Mr. Brackett was suffering from edema, a swelling from fluid buildup. Dr. Coleman found that the temperature of the legs was normal, and that the color was satisfactory, indicating that the major blood vessels were not blocked. He found that the tissue turgor was fine, meaning elastic, not dehydrated as one finds in association with chronic renal failure. Mr. Brackett had gained weight, which Dr. Coleman attributed to the gain in fluid from the edema of the legs. Brackett did not complain of bowel problems, as do patients with renal problems.
After performing the foregoing examinations and making these observations, Dr. Coleman concluded that Mr. Brackett had mild congestive heart failure, hypertensive cardiovascular disease, edema, and a flu-like *Page 1375 
illness. In accordance with this diagnosis, Dr. Coleman prescribed the following treatment:
 1. Dr. Coleman wrote prescriptions for apresazide and minipress, which are blood pressure medicines.
 2. Dr. Coleman prescribed ampicillin to ward off infection.
 3. Dr. Coleman prescribed dramamine for nausea. He also gave Mr. Brackett an injection of dramamine.
 4. Dr. Coleman gave Mr. Brackett an injection of lasix, a diuretic, to help his body rid itself of excess fluid.
 5. Dr. Coleman asked Mr. Brackett to return to his office the following day to have his weight checked. Although Mrs. Brackett insists that no such request was made, there was sufficient evidence presented to the jury to support the conclusion that such a request was made.
It is undisputed that Dr. Coleman did not perform a urinalysis or blood sugar test during Mr. Brackett's visit on February 15, 1984. The urinalysis would have detected protein and ketones in the urine, and Dr. Coleman admitted that the blood sugar test is the only way to confirm the amount of sugar in the blood. It is the appellant's contention that the failure to conduct these tests was a departure from reasonable medical care, and that this departure substantially contributed to the death of Mr. Brackett.
 Issue I
WHETHER THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY AS TO THE LEGAL EFFECT OF THE LEARNED TREATISES ADMITTED INTO EVIDENCE.
Two medical treatises were admitted into evidence at the plaintiff's request. These treatises were verified by plaintiff's expert as publications in the medical field that are generally recognized as standard and authoritative works in the diagnosis and treatment of the conditions experienced by Mr. Brackett.
The trial court, in its oral instruction to the jury, made no mention of these treatises or of their legal effect. In initially instructing the jury as to the effect of expert testimony, the trial court failed to indicate that the authoritative treatises admitted into evidence constituted expert evidence. During deliberations, the jury had some questions as to the effect of expert testimony. The trial court reinstructed the jury on this aspect of the case; however, no instruction was given that expert testimony is not limited to the opinions expressed by witnesses, but may also be contained in authoritative treatises admitted into evidence.
After the trial court reconvened following a weekend recess, the jury had no further questions and was sent back to the jury room to continue its deliberations. At this time, the appellant made her first exception to the oral charge failing to instruct the jury that the written treatises admitted into evidence were to be considered expert testimony. The plaintiff concedes that, in response to questions from the jury, the trial court simply recharged the jury as to the credibility of witnesses and the definition and instructions concerning expert witnesses.
Dr. Coleman maintains that the instructions given by the trial court are sufficient in this area. Also, Dr. Coleman asserts that the failure of the appellant to object to the trial court's original charge and her failure to submit written additional or explanatory instructions precludes her right to assign error on appeal.
The trial court's initial charge to the jury included the following instruction:
 "In a case of this nature, this standard is established by law and by the expert medical evidence presented for your consideration, including the testimony of physicians called as witnesses."
The inference from this charge is clear. The jurors are to consider all medical evidence, of which the testimony of doctors as witnesses is merely a portion.
As previously noted, at the time the charge was initially given, the appellant made no objection. We find the holding inJohnson v. McMurray, 461 So.2d 775 (Ala. 1984), to be dispositive on this issue. Where there is no proper objection to the court's oral charge, this Court is powerless to reverse, even if the appellant's argument is meritorious. Rule 51, Ala.R.Civ.P. *Page 1376 
 Issue II
WHETHER THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY AS TO THE "SHEER NUMBER" OF WITNESSES.
After the jury had been recharged following the receipt of an inquiry, appellant objected for the first time to the trial court's failure to charge the jury as to the "sheer number" of witnesses. In its additional charge to the jury, the trial court addressed the questions of the jury with regard to the issue of expert testimony, as follows:
 "A JUROR: . . . I don't know legally how far I can go standing here to say anything. What I'm saying is we've got some discussion about the three, the testimony of the three witnesses in this chair.
"THE COURT: Talking about the expert witnesses?
"FOREPERSON: Yes, sir.
 "A JUROR: The three doctors. We have a question. How much strength do these three witnesses' testimony have in saying if the doctor went away from the line.
". . . .
 "THE COURT: What I can do is to reinstruct you as to your duty concerning credibility of the witnesses. I can do that. And also give you instructions concerning expert witnesses. I can do that again if you want me to do that.
 "A JUROR: I think maybe if you would do this, I think maybe it might help us all a little bit."
The trial court thereupon repeated its oral charge with regard to expert testimony and expert witnesses; the charge contained the following instruction:
 "Witnesses have testified in this case as experts and have been permitted to express opinions or to draw conclusions. In passing upon the facts, you are not required to accept the conclusions or expressed opinions of expert witnesses but must determine for yourselves the weight to be given such testimony and evidence when considered in connection with all the other evidence material to the issue."
After this charge was given, the appellant expressly stated his objection as follows:
 "And the jury, in view of its questions, the plaintiff feels, should have been charged that the sheer number of witnesses called by one side does not in itself determine the weight to be given to their testimony or whether or not the burden of proof has been established. "I believe that was implicit in some of the questions asked."
The appellant argues that she did not waive her objection to the sufficiency of the charge by failing to object to the trial court's oral charge when initially given. Instead, when the trial court reinstructed the jury, she objected before deliberations resumed. Therefore, this alleged error, says the appellant, has been preserved on appeal. Assuming preservation of the issue, we disagree with the appellant's contention that the trial court erred in rejecting her oral request for additional instructions.
First, we note that the appellant called one medical expert witness, while Dr. Coleman called, in addition to himself, two other doctors who testified as experts. We do not perceive the instant case to be one where one side has been overwhelmed by a disproportionately high number of adverse witnesses. In the instant case, the instruction quoted above was sufficient to instruct the jury as to the weight to be given to the expert witnesses' testimony. Moreover, the jury was apparently satisfied with the trial court's additional instructions.
 Issue III
WHETHER THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT A DEPARTURE FROM THE APPLICABLE STANDARD OF CARE MAY BE SHOWN BY OMISSIONS THAT PROXIMATELY CONTRIBUTE TO DEATH.
The basis of Mrs. Brackett's claim against Dr. Coleman was that Dr. Coleman deviated from the applicable standard of care by omission. Specifically, the plaintiff claimed that Dr. Coleman failed to recognize that Mr. Brackett was suffering from kidney failure and diabetic ketoacidosis, *Page 1377 
rather than from congestive heart failure, and that, by failing to treat these conditions, Dr. Coleman's omission, or failure to act, proximately caused Mr. Brackett's death.
The trial court instructed the jury as to the standard of care owed by Dr. Coleman to Mr. Brackett as follows:
 "In order for the Plaintiff to recover, the material allegations of the complaint must be proven to your reasonable satisfaction: One, that there was some medical negligence on behalf of the defendant, and that negligence proximately caused the death of the deceased, Jesse Brackett."
In defining the term "negligence" for the jury, the trial court stated the following:
 "Ladies and gentlemen, I charge you that negligence is the failure to discharge or perform a legal duty owed to the other party."
Following the trial court's initial instructions, the jury returned with requests to be recharged. In response, the trial court gave the following charge:
 "All right. Let me go further and explain this: the burden of proof applies to all material elements of the complaint; one, that the defendant committed some act of negligence that proximately caused the death of the decedent, Jesse Brackett."
". . . .
 "Not only does the burden of proof extend to the act of negligence, it also extends to the proximate cause, proximate causation."
The trial court continued by reinstructing the jury as to its duty concerning the credibility of lay and expert witnesses. In the course of this instruction, the following exchange occurred:
 "A JUROR: Okay. And in the case of where because of what the defendant did not do was the cause of what happened, I'm asking —
 "THE COURT: That is one of the issues the jury must consider and determine, whether or not any negligence, if any, on behalf of the defendant proximately caused the death of the decedent, Jesse Brackett.
"A JUROR: Okay. That's fine.
 "THE COURT: That's one of the issues that you have to determine.
 "A JUROR: This is something that I think also had us causing a little bit of a problem.
 "THE COURT: Not only was there any negligence on behalf of the defendant but whether or not that negligence, if any, proximately caused the death of Jesse Brackett, the deceased."
After these reinstructions, the defendant's attorney requested that the trial court charge the jury "that negligence may be an act or omission which proximately causes an injury." The exception was noted, but no curative instruction was given.
When determining whether there is reversible error, the entire charge must be reviewed. Allen v. Mobile InterstatePile-drivers, 475 So.2d 530 (Ala. 1985). Where a term has been previously defined, it is not error to give an instruction that contains the term without restating the definition, unless the new instruction implies a contrary definition. Bradfordv. Birmingham Electric Co., 227 Ala. 285, 149 So. 729
(1933).
In light of the fact that the trial court defined negligence to include the "failure to discharge or perform a legal duty," an additional charge would have been an unnecessary duplication of a proper charge. A trial court should not be placed in error merely because its recharge does not restate all pertinent principles of law. See, e.g., Ole South Building SupplyCorp. v. Pilgrim, 425 So.2d 1086 (Ala. 1983). Therefore, it was not reversible error for the trial court to refuse to restate the definition of negligence, which had already been provided to the jury.
 Issue IV
WHETHER THE TRIAL COURT ERRED IN FAILING TO GIVE THE PLAINTIFF'S REQUESTED JURY CHARGE REGARDING THE BURDEN OF PROOF OF PROXIMATE CAUSATION.
The plaintiff requested that the trial judge give the following charge to the jury: *Page 1378 
 "The court charges the jury that the plaintiff does not have to prove that Jesse Brackett probably would have survived even if Dr. Coleman was not negligent. Should you find from the evidence that Dr. Coleman was negligent, and that his negligence was a proximate cause to the death of Jesse Brackett, then your verdict should be for the plaintiff."
The trial court did not give this instruction to the jury; the plaintiff noted her exception for the record and submits that the trial court's action in this regard constitutes reversible error.
The plaintiff contends that under the authority ofMurdoch v. Thomas, 404 So.2d 580 (Ala. 1981), andWaddell v. Jordan, 293 Ala. 256, 302 So.2d 74 (1974), the standard for determining the propriety of the submission of proximate cause to the jury does not encompass the "probability of survival" standard.
In response to the appellant's original exception, the trial court stated, "Well, I think [the exception] was addressed in giving your charge number 11 as amended." Charge number 11, as amended, reads as follows:
 "The court charges the jury that, in order to reasonably satisfy you that the plaintiff's death was proximately caused by the defendant's departure from the applicable standard of care, the plaintiff need not prove that prompt diagnosis and treatment would have prevented the plaintiff's death. You must be reasonably satisfied from the evidence that the death of Jesse Brackett would have been delayed, or a fatal heart attack would have been prevented by the exercise of reasonable care on the part of the defendant."
The language in the given charge substantially incorporates the substance of the refused charge. Additionally, the language of the given charge tracks the following quotation fromWaddell, supra:
 "[T]he medical testimony shows that although prompt diagnosis and treatment might not have prevented a massive heart attack, such could have delayed or even prevented a terminal attack and impeded further damage to the heart." Murdoch, 404 So.2d at 582, quoting Waddell, 293 Ala. at 259, 302 So.2d at 77.
Charging the jury that "the plaintiff need not prove that prompt diagnosis and treatment would have prevented the plaintiff's death," is essentially the same as charging the jury that "the plaintiff does not have to prove that Jesse Brackett probably would have survived." The refusal to give a requested charge is not error where the refused charge is substantially covered by another given charge. Ott v.Smith, 413 So.2d 1129 (Ala. 1982); Jefferson StandardLife Ins. Co. v. Pate, 290 Ala. 110, 274 So.2d 291 (1973);Nashville Broom Supply Co. v. Alabama Broom MattressCo., 211 Ala. 192, 100 So. 132 (1924). Therefore, in the instant case, since the refused charge was substantially covered in the given charge, the trial court did not commit reversible error in refusing the charge. We note, further, that the plaintiff's requested charge was confusing because of its inclusion of the word "even."
 Issue V
WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN INSTRUCTING THE JURY AS TO ALTERNATIVE METHODS OF TREATMENT.
In its instruction to the jury, the trial court gave the following charge:
 "Ladies and Gentlemen, I charge you that where there are various recognized methods of treatment, a physician is at liberty to follow the recognized method of treatment which he thinks is best, although witnesses have given their opinion that some other method would have been preferable."
The appellant filed a timely objection to this instruction, insisting that the given charge was not warranted by the evidence and that there was no testimony as to an alternative method of treatment. The given charge is from AlabamaPattern Jury Instructions, Civil, No. 25.04, and it is not contested that this charge is a correct statement of the law.See, Sims v. Callahan, 269 Ala. 216, 112 So.2d 776
(1959). *Page 1379 
The appellant's argument on this issue is as follows. The plaintiff presented evidence indicating that Dr. Coleman should have suspected renal failure and diabetic ketoacidosis in Mr. Brackett, should have performed the tests necessary to confirm these conditions, and should have treated these conditions when they were confirmed. Because no evidence was presented to show that Dr. Coleman's treatment of Mr. Brackett was appropriate for renal failure or diabetic ketoacidosis, says the appellant, it was error for the trial court to instruct the jury on alternative methods of treatment.
The trial court's charge to the jury included the following definition of "treatment," to which there was no objection:
 "The word 'treatment' as used in this charge covers all steps taken to effect a cure of an injury, illness, or disease, and includes examination and diagnosis as well as application of remedies."
In fact, the plaintiff's entire case was premised on the theory that Dr. Coleman had deviated from the standard of care by failing to perform a urinalysis and blood sugar test. Dr. Coleman, and expert witnesses on his behalf, testified that, based upon the findings of his office examination, there was no need for diagnostic or biochemical studies.
Dr. Coleman could be negligent for failing to treat renal failure or diabetic ketoacidosis only if he was negligent in failing to diagnose those conditions. Therefore, the question is not whether Dr. Coleman reached the correct diagnostic result or rendered the correct treatment, but rather whether he exercised such reasonable care, skill, and diligence as a physician would ordinarily exercise in a similar case. The law does not require a physician to be infallible in his treatment of a patient, and this Court has recently reaffirmed the "medical judgment rule," which stands for the proposition that a physician is not liable for malpractice when he makes an informed choice between viable alternatives, even though other experts, with the benefit of hindsight, testify that they would have chosen an alternate method of treatment. James v.Wooley, 523 So.2d 110 (Ala. 1988).
In light of the conflicting evidence presented on the issue of whether Dr. Coleman's failure to perform a urinalysis or blood sugar test was a deviation from the appropriate standard of care, the trial court was fully justified in charging the jury as to alternative methods of treatment.
 Issue VI
WHETHER THE DENIAL OF THE PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY CONSTITUTED REVERSIBLE ERROR.
The defendant called Julius Michaelson, M.D., as an expert witness. Approximately 40 days prior to the trial, the plaintiff had taken the deposition of Dr. Michaelson. At a pre-trial conference, counsel for the plaintiff objected to Dr. Coleman's use of Dr. Michaelson as an expert witness on the standard of care, based upon his deposition testimony, and requested an opportunity to examine Dr. Michaelson by voir dire prior to his trial testimony. The trial court permitted the voir dire examination.
The thrust of the appellant's argument is that the trial testimony of Dr. Michaelson is in direct conflict with the opinions expressed by him in his prior deposition testimony, and that Dr. Coleman should have notified the appellant of such change of testimony pursuant to Rule 26(e), Ala.R.Civ.P.
The trial court itself conducted a voir dire examination of Dr. Michaelson, during which the following occurred:
 "THE COURT: Are you saying, Dr. Michaelson, that in order for you to give an opinion as to the care and diagnosis rendered by Dr. Coleman that you would have had to examine this patient?
 "THE WITNESS: Indeed not, Judge. That is not what I am saying. That's not what I'm saying at all."
The trial court's determination as to the admissibility of Dr. Michaelson's testimony is discretionary. Absent "palpable abuse" of that discretion, its decision will not be disturbed on appeal. Maslankowski v. *Page 1380 Beam, 288 Ala. 254, 264, 259 So.2d 804 (1972).
The appellant asserts that the purpose of the discovery rules incorporated in the Alabama Rules of Civil Procedure is to eliminate "surprise" and "trial by ambush." In Erwin v.Sanders, 294 Ala. 649, 320 So.2d 662 (1975), this Court held that the trial judge did not abuse his discretion in permitting the expert to testify at trial despite the party's failure to supplement answers to interrogatories in a timely manner.
In the instant case, the appellant, at all times, was aware that Dr. Coleman intended to call Dr. Michaelson as an expert on the appropriate standard of care. The appellant's complaint as to conflicting testimony was fully considered by the trial court and the trial court acted within its sound discretion in admitting the testimony of Dr. Michaelson. Furthermore, the appellant was able to present to the jury all of the conflicts between Dr. Michaelson's trial testimony and his deposition testimony.
There was no prejudice to the appellant, who was given a full opportunity to cross-examine and attempt to impeach the expert testimony of Dr. Michaelson. The trial court acted within its discretion, and it did not commit reversible error in submitting the testimony of Dr. Michaelson to the jury.
 Issue VII
WHETHER THE TRIAL COURT'S ORDER GRANTING THE DEFENDANT'S MOTION IN LIMINE CONSTITUTED REVERSIBLE ERROR.
Prior to calling Dr. Michaelson as an expert witness, counsel for the defendant filed a motion in limine requesting that the court order that the plaintiff's counsel be prohibited from asking Dr. Michaelson whether he was insured by the same malpractice liability carrier that insured Dr. Coleman. For purposes of this motion, defense counsel stipulated that Dr. Michaelson was insured by Mutual Assurance Society of Alabama; that Dr. Coleman was also insured by Mutual Assurance Society of Alabama; and that Mutual Assurance Society of Alabama is a mutual insurance company.
Plaintiff acknowledges that in Otwell v. Bryant,497 So.2d 111 (Ala. 1986), this Court held that the trial court may properly exclude testimony that the defendant's experts belong to the same mutual liability insurance carrier as the defendant. The appellant asks us to revisit Otwell and reconsider its effect. This we are not prepared to do.
We find the holding in Otwell to be dispositive of this issue on appeal, and we hold that the trial court did not err in granting the defendant's motion in limine to prevent the plaintiff from asking Dr. Michaelson whether he was insured by the same malpractice liability carrier that insured Dr. Coleman.
Based on the foregoing, we hold that the trial court did not commit any reversible errors. Therefore, the judgment appealed from is due to be, and it hereby is, affirmed.
AFFIRMED.
JONES, ADAMS, HOUSTON and STEAGALL, JJ., concur.